[Cite as *In re T.A.*, 2013-Ohio-5646.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: T.A.
     T.A.

C.A. Nos.    13CA010439
               13CA010445


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.    11JC33947
             11JC33948

DECISION AND JOURNAL ENTRY

Dated: December 23, 2013

---

HENSAL, Judge.

**{¶1}** Appellants. Brytny M. ("Mother") and T.A. ("Father") appeal from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated their parental rights to their two minor children and placed them in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

**{¶2}** Mother and Father are the natural parents of twins, T.A. and T.A., born December 27, 2009. At the time this case began, the children were living with Mother, who was a minor at that time, and the maternal grandmother. The agency had received a variety of referrals about problems in the home, including that the twins' basic daily needs were not being met and that they were sometimes left home alone. The children had also required hospital treatment because one of them ingested cocaine and the other was covered with bedbug bites. LCCS also had

concerns about illegal drug use by both parents and allegations concerning Mother's mental health. On August 21, 2011, LCCS filed dependency and neglect complaints, and the children were removed from Mother's custody. The trial court later adjudicated them neglected and dependent children.

{¶3} Although the children were placed with a maternal great-grandmother for a period of time, she later informed LCCS that she was no longer able to care for the children. The children were then placed in a foster home where they remained throughout this case. During the next year, Mother made minimal progress on the reunification goals of the case plan. Specifically, she had not taken substantial steps toward achieving sobriety or addressing her mental health problems. Father initially made progress in substance abuse treatment and was eventually allowed to have an overnight visit with the children. Shortly afterward, however, Father began missing parenting classes and other case plan appointments and did not maintain contact with the caseworker or guardian ad litem. Because Father's whereabouts were unknown at that point, LCCS decided that reunification with Father was no longer a viable option for the children.

{¶4} LCCS had been unable to find a suitable relative who was willing to provide a permanent home for the children, so it moved for permanent custody of T.A. and T.A. Although a paternal great-grandmother had made some contact with the caseworker, she lived in Florida and had not complied with the caseworker's suggestions that she become more involved with the case by working a case plan, communicating regularly with the caseworker, and/or participating in periodic family team meetings via telephone.

{¶5} On the day initially set for the permanent custody hearing, both parents stipulated that the children could not be returned to their custody because they had failed to remedy their

problems with substance abuse. *See* R.C. 2151.414(E)(1). They asked, however, that the paternal great-grandparents be considered as legal custodians for the children. Because the great-grandparents lived in Florida and did not have an established relationship with the children, the trial court continued the best interest hearing to allow the great-grandparents more time to visit the children and demonstrate that they could provide T.A. and T.A. with a suitable permanent home. The trial court journalized the results of the first hearing, including that the matter would reconvene on May 6, 2013 for a hearing on the children's best interests. The journal entry further indicated that, "[a]t that time, the Court will consider paternal great grandparents as potential relative placements."

{¶6} On May 6, 2013, the best interest hearing was held before the trial judge. Although the paternal great-grandparents had not formally moved for legal custody, the hearing proceeded with the parties presenting evidence about the following alternate placements for the children: legal custody or temporary placement with the great-grandparents or permanent custody to the agency.

{¶7} Ten days after the hearing, and before the trial court had issued its judgment, it notified the parties that the foster father had passed away. During the next three weeks, none of the parties filed anything with the trial court to assert that the foster father's death should affect the court's ultimate judgment. On June 10, 2013, the trial court issued its final judgment. It found that permanent custody to LCCS was in the best interests of T.A. and T.A. and terminated the parents' rights. Father and Mother separately appealed and their appeals were later consolidated. Father raises two assignments of error and Mother raises one.

II.

FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO THE AGENCY RATHER THAN LEGAL CUSTODY TO PATERNAL GREAT-GRANDPARENTS, DESPITE DISCOVERING A MATERIAL CHANGE IN CIRCUMSTANCES FOLLOWING THE PERMANENT CUSTODY HEARING.

{¶8} Father's first assignment of error argues that, when the trial court learned about the foster father's death shortly after the permanent custody hearing, it should have either: (1) held another hearing to allow the parents to cross-examine witnesses about the impact of his death on the court's permanent custody decision, or (2) placed the children with the paternal great-grandparents because the foster parents were no longer a viable adoptive placement.

{¶9} As indicated already, after the trial court learned about the foster father's death, it journalized that fact on the record and notified all parties. The court then waited more than three weeks before it issued its final judgment. During that three-week period, however, Father did not ask the trial court to take evidence about the death of the foster father. In fact, none of the parties filed anything with the court to assert that the death of the foster father could or should have any impact on the permanent custody decision. Because Father raises this issue for the first time on appeal and does not argue plain error, this Court need not reach the merits of his assigned error. *See In re J.G.*, 9th Dist. Wayne No. 12CA0037, 2013-Ohio-417, ¶ 20.

{¶10} Moreover, although the trial court heard testimony that the foster parents were interested in adopting the children if LCCS was granted permanent custody, that potential adoption was not a focus of the trial court's permanent custody decision. The trial court's best interest determination was guided by specific statutory factors, which do not include the child's probability of being adopted. *See* R.C. 2151.414(D); *In re T.R.*, 120 Ohio St.3d 136, 2008-Ohio-

5219, ¶ 14. LCCS presented evidence at the hearing about the children's interaction with the foster parents and how well the children were doing in the foster home, but the primary purpose of that evidence was to demonstrate that their developmental delays and behavioral problems significantly improved when they were placed in a stable, secure, and loving environment. That evidence further demonstrated that, in contrast to their relationship with their parents and the paternal grandparents, the children had been able to develop a close bond with other caregivers and looked to them for love and support. Because Father has failed to demonstrate that the death of the foster father affected the propriety of the trial court's judgment, his first assignment of error is overruled.

### FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S JUDGMENT THAT PERMANENT CUSTODY TO THE AGENCY WAS IN [THE CHILDREN'S] BEST INTERESTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

### MOTHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN VIOLATION OF MOTHER'S [RIGHTS UNDER THE] FOURTEENTH AMENDMENT TO THE UNTIED STATES CONSTITUTION DUE PROCESS CLAUSE AND ARTICLE I SECTION SIXTEEN OF THE OHIO CONSTITUTION IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE, AND IN TERMINATING APPELLANT'S PARENTAL RIGHTS WHEN THE TRIAL COURT'S JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} This Court will address Father's second assignment of error and Mother's sole assignment of error together because they are closely related. Each parent asserts that the trial court's best interest decision was not supported by the evidence. Although Mother also argues that the trial court made errors in finding that the children could not or should not be returned to her custody, both parents waived any challenge to the trial court's finding under R.C.

2151.414(E)(1) by stipulating on the record that the first prong of the permanent custody test had been satisfied on that ground. Mother's brief includes additional arguments, such as the effectiveness of her trial counsel in entering such a stipulation, which this Court will disregard because she did not separately assign them as error. *See* App.R. 12(A)(1)(b) and App.R. 12(A)(2). This Court will confine its review to the evidence supporting the permanent custody decision.

{¶12} Before a juvenile court may terminate parental rights and award permanent custody of children to a children services agency, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the children are abandoned, orphaned, have been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶13} The trial court found that the first prong of the permanent custody test had been satisfied, based on a stipulation by all parties, that the children could not or should not be returned to either parent's custody because they had failed to remedy the problems that caused the continued removal of the children from their custody. *See* R.C. 2151.414(E)(1). The parties litigated only whether permanent custody was in the best interests of the children. Although the parents conceded that they were not able to provide their children with a suitable home at that time, they argued that the children should be placed with their paternal great-grandparents.

**{¶14}** Although the great-grandparents did not formally move for legal custody of the children, the trial court issued a journal entry on March 4, 2013, stating that it would take evidence at the best interest hearing to determine whether it should place the children with the great-grandparents. Because the trial court's decision whether to place the children in the custody of the paternal great-grandparents was also based on the best interest of the children, "this Court typically conducts a single 'best interest' review of the trial court's decision to place the child[ren] in the permanent custody of the agency rather than in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. If permanent custody is in the children's best interest, legal custody or placement with the great-grandparents necessarily is not. *Id.* "'Consequently, this Court will review the factors set forth in R.C. 2151.414(D) in reviewing the [best interest] decision of the trial court * * *.'" *Id.*, quoting *In re T-G.M.*, 9th Dist. Summit No. 25858, 2011-Ohio-3940, ¶ 13.

**{¶15}** When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency * * *.

R.C. 2151.414(D)(1)(a)-(d).[1]

{¶16} The interaction between the great-grandparents and the children had been very limited during the lives of these young children. The great-grandparents lived in Florida and, although the great-grandmother testified that she visited Ohio every summer, her husband apparently did not, and she did not explain the extent of contact, if any, that she had with the children before they were removed from Mother's custody. When the great-grandmother first contacted LCCS to express interest in providing an alternate placement for the children, the caseworker encouraged her to work a case plan at the same time as the parents, in case reunification with one or both parents was not possible. Nevertheless, although the great-grandmother communicated with Father and the maternal grandmother about what was happening in the case and tried to assist Father behind the scenes, she did not start working with LCCS to consider placing the children with her until it became apparent that reunification with Father would not be possible.

{¶17} During the first year of the case, the great-grandmother did not visit the children, work on a reunification plan, or even participate in family team meetings via telephone. The caseworker, a 15-year veteran at LCCS, testified that she has worked with many nonparent relatives and that she could "usually get a pretty good indicator of how serious a relative is" about providing a home for the children by how often they call her, how long they stay on the phone with her, and the types of questions that they ask. She would expect a relative who seriously wanted to keep the children with family and out of foster care to have become involved in family team meetings and call her often to check on the children. These grandparents, however, did not call the caseworker to ask about the children. Instead, they waited almost a

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case.

year before they started working with LCCS, allowing the children to remain in foster care and assimilate into another family.

{¶18} After visits with the children began, the great-grandmother visited the children only a few times and her husband visited them only once. During the visits with the children, the great-grandmother showed no affection toward them and would tend to watch them play with each other rather than interacting with them. The guardian ad litem opined that the children were not comfortable with the great-grandparents and that there was no loving bond between them. The guardian ad litem further testified that the great-grandmother did not redirect their misbehavior even when they were throwing toys or hitting each other.

{¶19} In contrast to the distant interaction between the children and their great-grandparents, the guardian testified about the positive interaction between the children and their foster mother. The foster mother was attentive, loving, and provided the children with firm boundaries. The children's speech and behavior had improved and they were thriving in the stable and loving environment in their foster home.

{¶20} Because the children were only three years old at the time of the permanent custody hearing, the guardian ad litem spoke on their behalf. She opined that permanent custody was in their best interests. She did not believe that the great-grandparents could provide them with a suitable home because they were not very attentive to the children and had no bond with them. She further testified that "[t]he children don't know these grandparents."

{¶21} By the time of the permanent custody hearing, the children had spent most of their lives in temporary homes and were in need of a legally secure permanent placement. Their parents were unable to provide them with a suitable home at that time or in the foreseeable future and LCCS had been unable to find a relative who was dedicated to providing them with a

suitable permanent home. Consequently, the trial court reasonably concluded that a legally secure permanent placement would only be achieved by terminating parental rights and placing the children for adoption.

{¶22} There was ample evidence before the trial court to support its conclusion that permanent custody to LCCS was in the best interests of T.A. and T.A. Father's second assignment of error and Mother's sole assignment of error are overruled.

## III.

{¶23} The parents' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

JENNIFER HENSAL
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

ROBERT CABRERA, Attorney at Law, for Appellant.

KATHLEEN M. AMERKHANIAN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and FAYE LIST, Assistant Prosecuting Attorney, for Appellee.