[Cite as *In re K.R.*, 2019-Ohio-2192.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: [K.R.] | : | |
| | | No. 18AP-633 |
| | : | (C.P.C. No. 14JU-7276) |
| [A.G. Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re: [Z.R.] | : | |
| | | No. 18AP-634 |
| | : | (C.P.C. No. 17JU-743) |
| [A.G. Mother, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re: [K.R.] | : | |
| | | No. 18AP-637 |
| | : | (C.P.C. No. 14JU-7276) |
| [A.R. Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |
| In re: [Z.R.] | : | |
| | | No. 18AP-638 |
| | : | (C.P.C. No. 17JU-743) |
| [A.R. Father, | : | (REGULAR CALENDAR) |
| Appellant]. | : | |

D E C I S I O N

Rendered on June 4, 2019

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief:** *James Sweeney Law, LLC*, and *James S. Sweeney*, for appellant A.G.

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant A.R.

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1}  Appellants, A.G. ("mother") and A.R. ("father") (collectively "parents"), parents of K.R. and Z.R. (collectively "the children"), appeal from the July 23, 2018 judgment entries of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, which terminated their parental rights and granted permanent custody of the children to appellee, Franklin County Children Services ("FCCS").  For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2}  On June 3, 2014, FCCS filed a complaint asserting K.R. was an abused, neglected, and dependent child.  Specifically, the complaint asserted four causes of action: abused child pursuant to R.C. 2151.031(C), abused child pursuant to R.C. 2151.031(D), neglected child pursuant to R.C. 2151.03(A)(2), and dependent child pursuant to R.C. 2151.04(C).  On June 4, 2014, a magistrate appointed by the trial court filed an order granting temporary custody of K.R. to FCCS and ordering parents to comply with visitation requirements.

{¶ 3}  On August 20, 2014, a case plan for K.R. was filed.  In the case plan, mother was required, in part, to obtain a legal means of employment and stable housing, ensure K.R. attended all medical appointments, receive all medical training specified by the medical treatment team, and participate in parenting classes.  Father was required, in part, to obtain a legal means of employment and stable housing, ensure K.R. attended all medical appointments, receive all medical training specified by the medical treatment team, complete parenting classes and a CPR course, and complete an updated sexual offender assessment.

{¶ 4}  On August, 22, 2014, the magistrate filed a decision, which was adopted by the trial court, finding K.R. to be an abused minor pursuant to R.C. 2151.031(C), a neglected

minor pursuant to R.C. 2151.03(A)(2), and a dependent minor pursuant to R.C. 2151.04(C), and dismissing the second abuse cause of action pursuant to R.C. 2151.031(D).  The court ordered father to have no unsupervised contact with K.R. and prohibited mother from being the supervisor of contact between father and K.R.  The court terminated the order of temporary custody to FCCS, approved and adopted the case plan, made K.R. a ward of the court, and placed him under protective supervision of FCCS.

{¶ 5}  On November 21, 2014, FCCS filed a motion for termination of court ordered protective supervision of K.R.  In the motion, FCCS stated that mother had substantially complied with case plan services and there was no longer a protective need.

{¶ 6}  On December 8, 2014, Court Appointed Special Advocates of Franklin County ("CASA"), the guardian ad litem of K.R., filed a motion for alternative disposition and for a shelter care hearing.  In the motion, CASA asserted it had received a report from staff of Nationwide Children's Hospital that K.R. exhibited suspicious bruising in a November 2014 visit to the hospital. CASA also alleged that mother had not been forthcoming with FCCS or CASA regarding father's contact with K.R.  On December 9, 2014, the magistrate filed an order granting temporary custody of K.R. to FCCS. On December 11, 2014, the magistrate filed a decision, which was adopted by the trial court, denying the November 21, 2014 motion for termination of court ordered protective supervision, granting the December 8, 2014 motion for shelter care, and ordering FCCS receive temporary custody of K.R.

{¶ 7}  On January 12, 2015, the magistrate filed a decision, which was adopted by the trial court, granting temporary custody of K.R. to FCCS and approving and adopting the case plan for K.R. that was attached to the decision.  Under the case plan, in addition to all prior directives, father was required to seek out an evaluation and comply with recommendations of domestic violence counseling.

{¶ 8}  On June 24, 2015, FCCS filed a motion requesting father be allowed to attend K.R.'s medical appointments and to attend visits in the home or community subject to supervision by a parent mentor or FCCS staff.  On July 1, 2015, the magistrate filed an order, which was adopted by the trial court on July 7, 2015, granting the motion to allow father to attend K.R.'s medical appointments and to have visitation rights subject to supervision.

{¶ 9}   On July 8, 2015, mother filed a motion for permanent custody of K.R.  On September 9, 2015, the magistrate filed, and the trial court adopted, a decision dismissing mother's July 8, 2015 motion for permanent custody and ordering FCCS maintain temporary custody of K.R.  On September 28, 2015, an amended case plan for K.R. was filed.

{¶ 10} On February 2, 2016, D.M., who alleged she was K.R.'s grandmother, filed a motion for legal custody of K.R. On April 27, 2016, over 16 months after receiving temporary custody of K.R., FCCS filed a motion for permanent custody of K.R.

{¶ 11} On January 19, 2017, FCCS filed a complaint in the trial court asserting Z.R. was an abused, neglected, and dependent child.[1]  Specifically, the complaint asserted four causes of action: abused child pursuant to R.C. 2151.031(C), abused child pursuant to R.C. 2151.031(D), neglected child pursuant to R.C. 2151.03(A)(2), and dependent child pursuant to R.C. 2151.04(C).  On January 20, 2017, the magistrate filed an order granting temporary custody of Z.R. to FCCS.  On March 20, 2017, the trial court filed a judgment entry amending the complaint, dismissing the cause of action of abuse pursuant to R.C. 2151.031(D), and the cause of action of neglect pursuant to R.C. 2151.03(A)(2), and finding Z.R. to be an abused and dependent child.

{¶ 12} On April 14, 2017, a case plan for Z.R. was filed. On April 17, 2017, the magistrate filed a decision, which was adopted by the trial court, granting FCCS temporary custody of Z.R., and approving and adopting the April 14, 2017 case plan for Z.R.

{¶ 13} On July 13, 2017, FCCS filed a motion for permanent custody of Z.R.  On August 16, 2017, the trial court filed a decision and entry dismissing the February 2, 2016 motion for legal custody of K.R. due to D.M.'s failure to prosecute.

{¶ 14} On October 20, 2017, CASA filed its reports as the guardian ad litem, recommending the court grant FCCS's motions for permanent custody of the children.  On March 23, 2018, FCCS filed a second motion for permanent custody of Z.R.  On June 4, 2018, the trial court commenced a hearing on the motions for permanent custody.

{¶ 15}  At the hearing on June 4, 2018, mother testified that at the time of trial K.R. was four years old and Z.R. was one year and eight months old.  Mother stated that A.R.

---

[1] FCCS noted in the complaint that this was the first refiling of the complaint.

signed an affidavit stating he was the biological father of K.R. Although he did not legally establish paternity for Z.R., mother stated A.R. was the biological father.

{¶ 16} In November 2013, when K.R. was born, parents were living together on Wisconsin Avenue in Columbus. Eight days after his birth, mother called an ambulance to take K.R. from their house to Nationwide Children's Hospital because he was lethargic. Mother stated K.R. woke up as soon as they arrived at the hospital when a nurse touched him with her cold hands. After a couple hours, K.R. was released from the hospital and mother took him home.

{¶ 17} On the same day, approximately half an hour to an hour after being released from the hospital, mother again called for an ambulance because K.R. was not breathing and was limp in her arms. Mother attempted to perform CPR on K.R. and observed blood coming from his nose. K.R. was again taken by ambulance to Nationwide Children's Hospital where he stayed for slightly under one month.

{¶ 18} K.R. was diagnosed with nonaccidental trauma, resulting in medical issues from which he continued to suffer at the time of the hearing. Mother stated K.R. had broken ribs, blood on the brain, a fractured arm, and seizures. At the time of the hearing, K.R. had cerebral palsy, developmental delays, an Individualized Education Program ("IEP"), and difficulty walking. Mother stated K.R. had a number of medical appointments, though fewer at the time of the hearing than previously.

{¶ 19} Mother agreed that someone injured K.R., but denied knowing who did it. However, mother testified that K.R. was alone with father when he was injured. Mother stated she did not want to believe that father had caused the injuries at the time, but knew at the time of the hearing that "he was the only one that it could have been." (June 4, 2018 Tr. at 57.)

{¶ 20} FCCS received custody of K.R. in December 2013 while he was in the hospital. In August 2014, K.R. returned to mother's sole custody under a protective supervision order.

{¶ 21} Several months after K.R. returned to mother's custody, mother took K.R. to Nationwide Children's Hospital because he had a rash, which mother believed was the result of bed bugs. K.R. was diagnosed with petechiae resulting from suffocation, but mother disagreed with the diagnosis. Mother stated that K.R. had what she believed was a

rash on his face, ears, chest, and back.  Mother also stated K.R. had a bruise on his head from falling into a coffee table while learning to walk.

{¶ 22}  Mother denied that anyone caused K.R.'s injuries, claiming they were caused by bed bugs. Mother stated she was living separately from father and was not in a relationship with him at the time of K.R.'s second injuries.  In December 2014, FCCS again received temporary custody of K.R., which it retained at the time of the hearing.

{¶ 23}  In September 2016, Z.R. was born. Mother entered into a voluntary case plan with FCCS, allowing her FCCS caseworker, Roni Bair, and a nurse to visit her at home to ensure Z.R.'s needs were being met.  Mother stated she only left Z.R. alone with his maternal grandmother.  However, after Z.R. was born, she lived with father, her sister, her sister's partner, and her sister's son.

{¶ 24}  When Z.R. was approximately six weeks old, mother took Z.R. to the Ohio State University Hospital because he was throwing up. Mother stated Z.R. was released from the hospital with instructions to take him to Nationwide Children's Hospital if he continued throwing up.  Three days later, on October 22, 2016, mother called an ambulance to take Z.R. to Nationwide Children's Hospital because he was having difficulty breathing.

{¶ 25}  Z.R. was diagnosed with brain bleeding, rib fractures on both sides, and nonaccidental trauma. As a result of his injuries, Z.R. was diagnosed with cerebral palsy. Mother agreed that someone hurt Z.R. Although mother stated only she and maternal grandmother were alone with Z.R., father was still in the house with Z.R.  Mother stated that father "would be in other rooms with [Z.R.] or when I was sleep[ing], [father] would get up in the middle of the night [with Z.R.] if he needed a diaper changed or anything." (June 4, 2018 Tr. at 69.)  Mother ended her relationship with father as a result of her belief that father caused the children's injuries.  Mother stated she had no contact with father for almost two years.

{¶ 26}  In October 2015, FCCS received temporary custody of Z.R., which it retained at the time of the hearing.  The children were later found to be abused.

{¶ 27}  In 2017, mother received medication from ViaQuest for attention deficit hyperactivity disorder ("ADHD") and depression.  Mother began seeking treatment for mental health issues at North Central beginning May 24, 2018, less than two weeks before the hearing.

{¶ 28} Mother agreed she was required as part of her court ordered case plan to attend the children's medical appointments and to understand what the children's special and medical needs were and to verbalize them. Mother stated she had not been to the children's medical appointments prior to January 2018 because she had depression. She overcame her depression on her own without medication or counseling. Mother asserted she had been more consistent in attending the children's medical appointments since January 2018. Mother claimed she had only missed 10 of the children's 52 medical appointments since January 2018, in addition to being late to three appointments.

{¶ 29} Mother disagreed that it would be difficult to take her children to medical appointments, stating "I mean if I drove myself there, well how hard would it be to put the kids in the car and drive in there?" (June 4, 2018 Tr. at 87.) Mother admitted she does not have a driver's license, but continues to drive her car. She stated she would not drive without a license with the children in the car.

{¶ 30} The case plan required mother to have housing and income sufficient for the children. She had been evicted four times from housing in her own name and one time from a property that was in her grandmother's name. Approximately one week before the hearing, she stopped living with her mother and signed a 24-month lease on a residence. Mother admitted that her new residence needed some work to be completed in order for it to be safe, such as installing a railing on the stairs, putting screens on windows, and putting carpeting over the tacks in the floor. However, she stated the work was being done that day to remedy the issues.

{¶ 31} Mother denied she ever had issues retaining housing because she struggled with maintaining a steady income. Mother claimed she was employed at Columbia Home Health Aide since the end of February 2018, making almost $1,000 every two weeks.

{¶ 32} Prior to January 2018, mother had not been visiting the children consistently. In September 2017, her visits with the children were reduced from twice to once a week due to the fact that she was missing so many visitation appointments. Since January 2018, mother had been visiting the children consistently, only missing two visits because she went to St. Louis to see her grandfather, who was ill.

{¶ 33} Dr. Douglas Pawlarczyk, Ph.D., a psychologist with Netcare Access, provided expert testimony. Dr. Pawlarczyk conducted a psychological evaluation of mother,

including an I.Q. test, Rorschach Inkblot test, and a Thematic Apperception test. Mother was unable to complete a true/false questionnaire to measure emotional dynamics because she struggled to read the questions. She was able to complete a parenting capacity questionnaire, which Dr. Pawlarczyk read to her in order to ensure she understood the questions.

{¶ 34} Dr. Pawlarczyk had difficulty interviewing mother because she kept changing her recollection of what happened. Mother's mood was good on the day of the evaluation; she seemed nonchalanat and upbeat. Dr. Pawlarczyk perceived her behavior as odd considering the circumstances of her evaluation, coupled with the fact that she seemed unconcerned about it.

{¶ 35} Mother performed in the borderline range on the I.Q. test, but Dr. Pawlarczyk believed the test underestimated her ability due to difficulty concentrating. Dr. Pawlarczyk found mother's difficulty concentrating was consistent with the history she provided. Mother was guarded in revealing information about herself in the Rorschach Inkblot and Thematic Apperception tests.

{¶ 36} Dr. Pawlarczyk diagnosed mother with two disorders: (1) ADHD, predominantly inattentive presentation, meaning she was not hyperactive but had problems with attention and impulse control, and (2) antisocial personality disorder. Dr. Pawlarczyk stated that people with antisocial personality disorder may feel they are not subject to rules, which results in legal difficulties or inability to follow societal expectations. Additionally, people with antisocial personality disorder have difficulty bonding with other people. Dr. Pawlarczyk found the antisocial personality disorder to be consistent with mother's description of her history, tendency to provide contradictory information, and to having a guarded approach with diagnostic testing. Dr. Pawlarczyk stated that neither counseling nor medication would help with antisocial personality disorder.

{¶ 37} Dr. Pawlarczyk also conducted a parent-child observation to gain information on mother's relationship with the children. Mother did assume responsibility for the children even though there were two other adults in the room. K.R. was very active and interacted well with others. K.R. wanted to have mother respond to him, which Dr. Pawlarczyk said was "not that unusual for a child that doesn't see their mother that often." (June 4, 2018 Tr. at 160.) Mother fed Z.R. and handled him appropriately.

{¶ 38} Dr. Pawlarczyk recommended mother have a parenting mentor in order to teach her how to respond to the children and develop relationships with them. Dr. Pawlarczyk found mother did not seem bonded to the children or concerned about their functioning, especially when considering the history of not being able to complete the case plan and the nonchalant behavior in the evaluation.

{¶ 39} Dr. Pawlarczyk stated that his biggest concern with determining whether mother was able to successfully parent the children was how her character problem would affect her children. He stated that mother "may direct her attention to other things that are important to her as opposed to what [the children] need." (June 4, 2018 Tr. at 163.) Finally, he stated that "the most dangerous thing was that she wouldn't attend to their needs and something could happen to them." (June 4, 2018 Tr. at 163.)

{¶ 40} Mother told Dr. Pawlarczyk she was involved with FCCS because one of her children had a brain injury but she was not certain of the cause of the brain injury. Mother reported she was sent to ViaQuest for diagnosis. At ViaQuest, she received medication for ADHD symptoms but stopped taking the medication. Mother did not report any history of depression.

{¶ 41} Dr. Pawlarczyk found that mother's explanations for her employment history did not always make sense. Mother stated she ended the relationship with father because FCCS wanted her to end it.

{¶ 42} Bair, the FCCS caseworker assigned to the children, testified that FCCS became involved with the children when, eight days after K.R. was born, it was alleged he had injuries that were not accidental. FCCS first received temporary custody of K.R. on December 7, 2013. Prior to Bair becoming a caseworker for the children, K.R. had been reunified with mother until December 2014 when he was again placed in FCCS's custody. When Bair became the caseworker, FCCS had already filed for permanent custody of K.R., who was in a foster home.

{¶ 43} From her knowledge of the case history, Bair recalled that father was allowed to visit K.R., but mother was not allowed to supervise those visits. K.R. was placed in FCCS's custody the second time in part because father had access to K.R. in contravention of this requirement and because Nationwide Children's Hospital reported K.R.'s diagnosis of petechiae.

{¶ 44} Bair learned that mother was pregnant two weeks before she gave birth to Z.R. After Z.R. was born, FCCS and parents entered into an agreed safety plan. Bair and a nurse were permitted to visit the home weekly to check on Z.R. For six weeks after Z.R. was born, FCCS discussed concerns related to safe sleeping spaces for Z.R. On October 25, 2016, when Z.R. was six weeks old, FCCS received temporary custody of Z.R. after learning he had been taken to Nationwide Children's Hospital with nonaccidental injuries. Bair stated she recommended or agreed with the filing of the complaint regarding Z.R. because Z.R.'s injuries demonstrated a lack of appropriate parenting while with mother. Z.R. has continuously been in FCCS custody since that date.

{¶ 45} Bair stated that mother's responsibilities under the family case plan included ensuring safety of the children, ensuring the children arrived at medical and school appointments, following recommendations from teachers and medical professionals, and maintaining stable housing and income. Mother often missed the children's medical appointments and visitation, claiming she had trouble with transportation or had to work during those appointments. FCCS provided mother with bus passes for her use with visitations or medical appointments in the event her car was not working.

{¶ 46} Bair testified that, at a meeting between mother and doctors to discuss the cause of K.R.'s injuries, mother did not demonstrate an understanding of K.R.'s special needs and did not understand how he received his injuries. Specifically, mother failed to understand the need for K.R. to wear leg braces and the need to carefully monitor his food and behavior while eating.

{¶ 47} Prior to Z.R.'s removal, parents participated equally in the case plan. After FCCS received custody of Z.R., parents did not participate with FCCS. In June 2017, mother's visitations with the children were reduced from twice a week to once a week because she was frequently missing one day a week. Around fall 2017, mother became more involved again in the case plan. Bair provided referrals for mother for parenting and mental health.

{¶ 48} Bair provided referrals to father for substance abuse. Under the case plan, father was supposed to participate in sex offender treatment, mental health treatment, and substance abuse treatment. Father was also supposed to ensure the safety of the children, ensure they were attending appointments, and attend visits with the children. Father was

also expected to maintain stable employment and housing. Bair testified father failed to make progress on any of the elements of the case plan. In June 2017, father stopped visiting the children. Bair had no contact with father after July 2017 and did not know where he was living or have a way of contacting him.

{¶ 49} In fall 2016, FCCS received paperwork from mother that she was working at Speedway, but did not receive paystubs. Bair stated that mother worked at Speedway for six months until she decided to become a home health aide. As of November 2017, when Bair stopped being the family's caseworker, mother had not begun working as a home health aide. However, mother had been referred to mental health services and was attending visits with the children.

{¶ 50} During the case, mother relocated seven times for various reasons, including several evictions. In November 2017, mother had not resolved issues with her case plan because she did not have stable, independent housing or stable, verifiable income. In November 2017, mother was living with maternal grandmother. A home study of maternal grandmother's home was denied. Bair stated there would have been a place for the children at maternal grandmother's home, although she would have concerns with space for both children in addition to the other people living in the home.

{¶ 51} Bair stated the children seemed bonded to each other as well as to parents. Parents were bonded with the children, though father had more difficulty bonding with Z.R. Bair also stated that, if a parent does not visit a child for an extended period of time, the lack of visitation could affect the bond between the parent and child.

{¶ 52} Both children have special needs and are connected with several departments through Nationwide Children's Hospital. K.R. was linked with developmental disabilities, speech, occupational, and physical therapy, and behavioral assessment. When he was four years old, K.R. was not able to use a restroom, was speech delayed, and could not feed himself. Z.R. was linked with Help Me Grow and developmental disabilities to assess growth and development.

{¶ 53} For the entire time Bair served as caseworker, B.R. was the children's foster parent. Bair stated that the children were bonded with B.R. However, B.R. is not interested in being considered for an adoptive home for the children. Bair stated that, if B.R. is not

interested in adoption, another prospective adoptive home would be recruited for the children by FCCS.

{¶ 54} B.R. testified at the hearing that she was the foster parent of K.R. and Z.R. B.R. described K.R. and Z.R. as bonded to one another and the other children in her home. B.R. stated it was not her intention to adopt any children, including K.R. and Z.R.

{¶ 55} B.R. stated that K.R. had special needs and had been diagnosed with cerebral palsy. Nationwide Children's Hospital provided treatment for K.R., including behavioral, occupational, and speech therapy. K.R. received occupational and speech therapy every other week and behavioral therapy on a weekly basis. K.R.'s behavioral therapy was intended to build a caregiver-child relationship in order to assist with K.R.'s tantrums and acting out, so that K.R. might pursue additional therapy in the future.

{¶ 56} Additionally, K.R. had standing follow-up appointments at Nationwide Children's Hospital developmental disability clinic every three to four months and the cerebral palsy clinic every year. K.R. had issues with his eye requiring follow-up appointments every three to six months. K.R. attended preschool and had an IEP. B.R. participated in parent-teacher conferences a couple times per year in addition to meetings to review the IEP.

{¶ 57} B.R. testified that Z.R. had special needs and had recently been diagnosed with cerebral palsy. Z.R. had physical and occupational therapy sessions every week in addition to speech therapy every other week. Z.R. participated in Help Me Grow and the developmental disability clinic. Z.R. had appointments with an ear, nose, and throat doctor because he had tubes placed in his ears. Z.R. also had issues with eating.

{¶ 58} B.R. was responsible for getting the children to all of their appointments. Mother attended the medical appointments about 65 percent of the time, whereas father was no longer attending the children's appointments. From January 2018 until the date of the hearing, the children had 52 total appointments, but mother was present for only 35. Prior to January 2018, mother missed a similar number of medical appointments.

{¶ 59} B.R. testified that K.R. was generally excited to visit with mother and he was bonded with her. K.R. generally became upset for a couple minutes after the visitation ended.

{¶ 60} Lynn Sowards, LISW, the associate director of FCCS, testified at the hearing that she had been involved with the children's case since August 2014. Sowards stated that parents had not successfully completed the case plan because they did not regularly attend visitations, did not regularly attend medical appointments, demonstrated a lack of understanding of the children's specialized needs, had not developed parenting skills in order to prevent further trauma, and failed to participate in the recommendations from assessments.

{¶ 61} Additionally, Sowards stated parents had failed to maintain stable housing and income. Parents had worked with a parent mentor, but most of the casework had been dedicated to finding stable housing and employment, and getting to appointments. Sowards specifically pointed to mother's 4 evictions and 12 different addresses over the duration of the case as evidence of her failure to obtain stable housing.

{¶ 62} Sowards stated that mother's failure to consistently attend the children's medical appointments prevented her from learning the medical requirements needed to keep them safe in order to provide them with full-time parenting. As a result, Sowards stated mother had not demonstrated an ability to meet the children's basic needs as required by the case plan.

{¶ 63} C.D., the children's lay guardian ad litem, testified the children seemed comfortable in their foster home. C.D. stated the children and mother appeared to be bonded with one another, but had not observed father with the children because he did not visit consistently. C.D. believed the children were bonded with each other.

{¶ 64} K.R. was able to verbalize his wishes, but was not consistent in stating with whom he preferred to live, stating at different times he wished to either live with B.R. or mother. C.D. was not certain that K.R. was able to understand his preferences in terms of a living situation. K.R. referred to B.R. and mother both by their individual names as well as "mom." (June 5, 2018 Tr. 240.) C.D. believed K.R. could not understand the concept of adoption.

{¶ 65} C.D. recommended the court grant the motion for permanent custody. In support of her recommendation, C.D. stated that mother offered differing accounts of the reasons for the children's injuries. C.D. stated that mother demonstrated her children were not a priority because she failed to attend or was late to appointments. C.D. did not believe

that mother would make the right choice to protect the children and keep them safe. In support of her statement that mother might not keep the children safe, C.D. stated that "[K.R.] was injured once and then [mother] had another opportunity with him, and he's injured again, and then she has another child, has another opportunity to make different choices to make sure that the child's not in harm's way, but whatever choices were made, the child was in harm's way again." (June 5, 2018 Tr. at 276.)

{¶ 66} On July 23, 2018, the trial court filed a judgment entry granting FCCS's motions for permanent custody of the children.

## II. Assignments of Error

{¶ 67} Mother assigns a single error for our review:

> The trial court's finding that [FCCS's] motion for permanent custody was supported by clear and convincing evidence was against the manifest weight of the evidence.

{¶ 68} Father assigns a single error for our review:

> The juvenile court's judgment granting permanent court commitment of the minor children to [FCCS] was against the manifest weight of the evidence.

For ease of discussion, we consider parents' assignments of error together.

## III. Whether Granting Permanent Custody Was Against Manifest Weight of the Evidence

{¶ 69} In their assignments of error, parents assert the trial court's judgment granting permanent custody of the children to FCCS was against the manifest weight of the evidence.

## A. Applicable Law

{¶ 70} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). "Permanent termination of parental rights has been described as 'the family law

equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991).

{¶ 71} However, the state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 28, citing R.C. 2151.01. An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 72} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to an agency if the court determines, by clear and convincing evidence, that: (1) it is in the best interest of the child, and (2) one of the four factors set forth in R.C. 2151.414(B)(1) applies. The fourth factor described in R.C. 2151.414(B)(1) is that "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." R.C. 2151.414(B)(1)(d).

{¶ 73} If the statutory factor in R.C. 2151.414(B)(1)(d) is established, the trial court is authorized to grant a motion for permanent custody if clear and convincing evidence supports it is in the children's best interest. *In re W.W.E.*, 10th Dist. No. 15AP-167, 2016-Ohio-4552, ¶ 51. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435 (finding it is not necessary for evidence to be "unequivocal" in order to meet the clear and convincing standard).

{¶ 74} In determining whether granting permanent custody to a public children services agency is in the child's best interest, the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-

home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order

was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 75} Moreover, in determining the best interest of the child, the court "shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child."  R.C. 2151.414(C).  *See In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 36.  Similarly, R.C. 2151.414(C) prohibits a court from "deny[ing] an agency's motion for permanent custody solely because the agency failed to implement any particular aspect of the child's case plan."

## B. Standard of Review

{¶ 76} On appeal, we will not reverse a trial court's determination that it was in the best interest of the children to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence.  *L.W.* at ¶ 8; *W.W.E.* at ¶ 54. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' "  (Emphasis deleted.)  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See C.G.* at ¶ 31; *W.W.E.* at ¶ 54. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a

manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 77} In conducting our review, we must make every reasonable presumption in favor of the trial court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, we recognize that " '[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned.' " (Quotations and citation omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34, quoting *In re A.D.*, 10th Dist. No. 08AP-238, 2008-Ohio-3626, ¶ 8.

## C. Analysis

{¶ 78} Initially, we note the record reflects and the parents do not contest that the children had been in the custody of FCCS for 12 or more months of a consecutive 22-month period at the time of the hearing. Accordingly, because the statutory factor set forth in R.C. 2151.414(B)(1)(d) was established, the court was statutorily authorized to grant FCCS permanent custody of the children if clear and convincing evidence existed that it was in the children's best interest to do so. *W.W.E.* at ¶ 51; *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 19.

{¶ 79} Here, the trial court stated that upon "review and weighing the evidence (all relevant factors) the court finds, by * * * clear and convincing evidence, that granting [FCCS's] motion for permanent custody is in the best interest of [the children]." (Emphasis omitted.) (July 23, 2018 Jgmt. Entry at 17.) In reviewing the trial court's determination, we consider the evidence as to the factors specifically listed in R.C. 2151.414(D)(1), as well as any other relevant factors, as provided by that statute.

{¶ 80} Under the first factor, the trial court must consider the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child."

R.C. 2151.414(D)(1)(a). On appeal, mother asserts the trial court failed to properly consider the bond between mother and the children in its best interest analysis. Father also asserts the trial court failed to consider his bond with the children in making its determination.

{¶ 81} Although Dr. Pawlarczyk stated there did not seem to be much of a bond between mother and the children, other testimony from Bair, B.R., and C.D. supported a finding that mother and the children were bonded with one another. Additionally, Bair stated father was bonded with the children, though she noted there was more difficulty with Z.R. The trial court noted in its decision C.D.'s testimony that the children were bonded with mother and Bair's testimony regarding the parents' visits with the children. The trial court specifically found K.R. was bonded with mother. However, resolution of the first factor is not limited to merely the bond between child and parent.

{¶ 82} Courts have considered the consistency of a party's visitation with a child when resolving the R.C. 2151.414(D)(1)(a) factor. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 59 (noting the "inconsistent visitation of [the child's] natural parents"); *In re S.C.*, 9th Dist. No. 04CA008469, 2004-Ohio-4570, ¶ 36. Father stopped visiting the children in June 2017 and, according to Bair, never resumed contact. Mother's visits were reduced from twice a week to once a week in June 2017 because she was frequently missing one of the two visits each week. The trial court stated that mother's "participation in [case plan] services fell off after [Z.R.'s] removal" and that "[h]er participation only became more consistent toward the end of 2017." (July 23, 2018 Jgmt. Entry at 15.) However, mother never resumed twice-weekly visits with the children and was present at only 35 of the children's 52 medical appointments from January 2018 until the date of the hearing. As a result, we cannot find the trial court erred in its consideration of the interaction and interrelationship of the children with their parents under R.C. 2151.414(D)(1)(a). *Schaefer* at ¶ 59; *In re H.M.S.*, 10th Dist. No. 05AP-613, 2006-Ohio-701, ¶ 34 (finding that the "parties also failed to demonstrate concern for the child by frequently missing visitations and [the child's] doctors' appointments"); *S.C.* at ¶ 36 (stating that in determining the interaction and interrelationship factor, the "trial court was also permitted to consider that over the course of one year, [the] Appellant attended less than half of the scheduled visitations, including a significant period of time when she was completely absent from visits").

{¶ 83} Under the second factor, the court must consider the "wishes of the child." R.C. 2151.414(D)(1)(b).  The court found K.R. was inconsistent in stating he preferred to live with mother, B.R., or both.  Additionally, the court found Z.R. was too young to understand and verbalize his wishes. C.D. recommended the trial court grant the motions for permanent custody.

{¶ 84} Under the third factor, the court must consider the "custodial history of the child."  R.C. 2151.414(D)(1)(c).  The court found both children had been in FCCS's custody for more than 12 months of a consecutive 22-month period.

{¶ 85} Under the fourth factor, the court must consider the "child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency."  R.C. 2151.414(D)(1)(d).  The trial court found the children could not be placed with the parents, because the "[p]arents are not able or willing to meet the needs of the Children."  (July 23, 2018 Jgmt. Entry at 17.)  Mother argues on appeal that the trial court failed to properly consider her improvement when determining that permanent custody was in the children's best interest.  Specifically, mother argues she resolved issues related to legal proof of income, stable housing, and attending medical appointments.

{¶ 86} With regard to mother's attendance at the children's medical appointments, testimony reflected that she missed 35 of the 52 appointments from January 2018 until the date of the hearing.  Mother acknowledges her absences at these appointments, but states that "[w]hen considering this statistic, it is important to understand that the foster mother, [B.R.], is the person who scheduled the appointments, not [mother]."  (Mother's Brief at 13.)  Regardless of who scheduled the appointments, mother does not dispute that the case plan required her to ensure the children's attendance at medical appointments.  Furthermore, mother does not claim she attempted to reschedule the appointments.

{¶ 87} With regard to mother's housing and employment, the trial court made the following findings:

> Mother was apparently employed in December of 2014. Mother reported that her longest period of employment was at a gas station from December 2016 until August 2017. She left that job because she thought she had another job. She did not. As recently as February 8, 2018, Mother worked only one day a week. She testified that she is presently employed as a

home health aide, but she did not provide verification of this employment.

As to the stability of her housing, Mother had at least seven (7) relocations of residence during her involvement with the Agency. The parent mentor had listed twelve (12) different addresses for Mother. Mother had at least four (4) evictions during the Agency's involvement with her family. (The lack of stable employment may have been a factor in her evictions.) Mother was never homeless, as she would stay with her mother, the Children's maternal grandmother, when necessary. (Maternal grandmother's home was inappropriate for the Children, as she had involuntarily lost the permanent custody of a child.) In June 2018, mother claimed to have housing and employment. However, she provided no verification of either at the termination hearing.

Mother clearly lacked stable housing for herself during the reunification plan. There continues to be significant doubt that Mother would provide stable housing for the Children and maintain stable income upon reunification.

(July 23, 2018 Jgmt. Entry at 14.) Thus, the trial court specifically noted mother's testimony regarding the recent changes to her employment and housing situation. However, a court is not limited to considering only current compliance with case plan objectives related to housing and income in its analysis of the child's need for a legally secure, permanent placement. *In re R.L.*, 10th Dist. No. 07AP-36, 2007-Ohio-3553, ¶ 15-17 (finding there was clear and convincing evidence that permanent custody was in the child's best interest despite parent's argument that "her recent employment and current living arrangement * * * should wholly displace her lack of initiative prior thereto").

{¶ 88} Sowards testified mother had not demonstrated an ability to meet the children's basic needs as required by the case plan because she did not maintain stable housing or income to meet the needs of the children. C.D. noted mother's recent employment history "seem[ed] to be very beneficial for her," but she did not agree that reunifying the children with mother would result in a legally secure, permanent placement. (June 5, 2018 Tr. at 245.) Thus, we cannot find the trial court erred in its consideration of the children's need for legally secure, permanent placement under R.C. 2151.414(D)(1)(d).

{¶ 89} Under the fifth factor, the court must consider "[w]hether any of the factors in [R.C. 2151.414(E)(7) through (11)] apply in relation to the parents and child." R.C.

2151.414(D)(1)(e). The trial court found that "[n]o evidence was offered as to the best interest factors listed in [R.C. 2151.414(E)(7) through (11)]." (July 23, 2018 Jgmt. Entry at 17.)

{¶ 90} Although not listed under its analysis of the factors specifically identified in R.C. 2151.414(D)(1), the trial court made the following findings in determining the best interest of the children:

> The circumstances of Mother driving without a license, her lack of stable housing and income, her unusual work schedule, her immediate need to find a daycare provider willing and able to care for two children with cerebral palsy, her unrealistic notion that all things are possible without planning and preparation, her borderline cognitive ability, "her problems with concentration/attention [making] it quite difficult for her to engage in new learning", her mental health diagnosis and lack of treatment, her failure to arrive on time for something as important as the termination hearing, and her failure to protect the children in the past, together raise an overwhelming doubt that Mother, now or in the foreseeable future, would be able to meet the Children's basic needs.

(July 23, 2018 Jgmt. Entry at 16.)

{¶ 91} Finally, the parents assert the trial court failed to consider that B.R. did not intend to adopt the children. We have previously stated that although "the likelihood that a child will be adopted may be considered in determining the child's best interest," the statutory provisions "governing permanent custody simply do not require an agency to prove that adoption is likely." *V.B.-S.* at ¶ 51. *See In re T.R.*, 120 Ohio St.3d 136, 2008-Ohio-5219, ¶ 14 (stating that "while a juvenile court reviewing a motion for permanent custody was at one time required to consider the child's probability of being adopted, * * * the current statutory framework does not expressly require the court to consider this information in making a best-interest determination"); *In re T.A.*, 9th Dist. No. 13CA010439, 2013-Ohio-5646, ¶ 10 (stating that "[t]he trial court's best interest determination was guided by specific statutory factors, which do not include the child's probability of being adopted"); *In re M.W.*, 8th Dist. No. 105565, 2017-Ohio-8580, ¶ 25-26. The Supreme Court of Ohio has stated that "[w]hile it certainly may be helpful for a court to know the agency's adoption plans, the court is not required to factor adoption possibilities into its analysis, and the agency will be bound to seek adoption for the child if

permanent custody is granted regardless of whether the plans are filed before the motion is considered." *T.R.* at ¶ 16.  Therefore, although the children's current foster parent did not plan to pursue adoption, we cannot find the trial court erred in determining that it remained in the children's best interest to grant the motion for permanent custody.  *V.B.-S.* at ¶ 15.

{¶ 92} Upon review of the record, we find there was clear and convincing evidence that granting the motion for permanent custody was in the best interest of the children. Therefore, we find the trial court's decision was not against the manifest weight of the evidence.  Accordingly, we overrule mother's assignment of error and father's assignment of error.

**IV. Conclusion**

{¶ 93} Having overruled mother's sole assignment of error and father's sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.

————————————