[Cite as *In re T-G.M.*, 2011-Ohio-3940.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: T-G.M.
     T.M.

C.A. No. 25858

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.   DN 09-03-236
                DN 09-03-237

DECISION AND JOURNAL ENTRY

Dated: August 10, 2011

MOORE, Judge.

{¶1} Father, Tyrone M., appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor children, T-G.M. and T.M., and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Andressa C. ("Mother") and Tyrone M. ("Father") are the parents of T-G.M., born April 9, 2007, and T.M, born March 27, 2008. Mother voluntarily surrendered her parental rights to the children and filed an appellate brief in support of the trial court judgment. Father has appealed to this Court, challenging the trial court's termination of his parental rights and its denial of legal custody to the paternal grandparents.

{¶3} CSB initially became involved with the family on March 16, 2009 after the paternal grandfather called the police to his home because of a physical confrontation between

Mother, who was holding T.M. in her arms, and the children's paternal uncle. The police removed both children pursuant to Juv.R. 6 and notified CSB. The following day, CSB filed complaints in juvenile court and obtained emergency temporary custody of the children.

{¶4} On April 24, 2009, the children were adjudicated dependent and placed in the temporary custody of the agency. The initial case planning goal was reunification. At that time, Father was already attending anger management and domestic violence classes through an existing probation requirement and was asked to continue those. He was also asked to engage in parenting classes, drug counseling and drug screens, mental health counseling, and to seek employment. Mother was to engage in mental health counseling and avoid abusive relationships. After she tested positive for marijuana, a chemical dependency component was added to her case plan.

{¶5} During the ensuing two years, the children remained in foster care. Father was incarcerated for much of that time. Mother attempted to work on her case plan, but ultimately surrendered her parental rights. CSB approved two sets of relatives for placement, but those relatives eventually decided that they were unable to provide long-term care for these young children.

{¶6} Father moved for custody in himself or with the paternal grandparents. On September 3, 2010, CSB moved for permanent custody of both children. Following a hearing on these motions, the trial court granted permanent custody of the children to CSB. Father appeals and assigns two errors for review.

II.

## ASSIGNMENT OF ERROR I

"THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## ASSIGNMENT OF ERROR II

"THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN DENYING FATHER'S MOTION FOR LEGAL CUSTODY OF THE CHILDREN TO [PATERNAL GRANDPARENTS]."

{¶7} Father contends that the trial court erred in finding that the weight of the evidence supported a grant of permanent custody to the agency, and he also contends that the trial court erred in denying his motion for legal custody to the paternal grandparents. Because these arguments are legally and factually related, this Court will address them together.

{¶8} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 99.

{¶9} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. The trial court also found that the children could not or should not be returned to the custody of either parent in that Father failed to complete his case plan objectives and is in prison, and Mother believes permanent custody is in the children's best interests. Father does not contest either first prong finding, but rather challenges the second prong finding that it was in the best interest of the children to be placed in the permanent custody of the agency.

**{¶10}** That permanent custody is in the best interest of the child must be established by clear and convincing evidence. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, paragraph three of the syllabus.

**{¶11}** This Court has previously held that the appropriateness of legal custody essentially invokes consideration of the same factors as a determination of the best interest of the child for purposes of a permanent custody decision. See *In re S.S.*, 9th Dist. No. 23859, 2007-Ohio-7046, at ¶13, citing *In re S.N.*, 9th Dist. No. 23571, 2007-Ohio-2196, at ¶27 and R.C. 2151.414(D).

**{¶12}** Father cites *In re S.S.* in support of his position that he has standing to challenge the denial of his motion for legal custody to relatives, but he also claims that our decision in *In re C.D.*, 9th Dist. No. 22250, 2005-Ohio-158, at ¶7, is inconsistent with that position. In *In re C.D.*, we merely emphasized that the parent has standing to challenge a trial court's decision denying legal custody to a relative and granting permanent custody to an agency for the reason that such a decision affects the parent's residual rights. Id. We address this matter only to conclude that we find no inconsistency in our precedent insofar as it applies to the case before us.

**{¶13}** The issues of denying legal custody to a relative and granting legal custody to an agency are really two sides of the same coin. As stated above, the best interest considerations for both are essentially the same. If a court finds that it is in the best interest of the child to be placed in the permanent custody of an agency, then it is not in that child's best interest to be placed in the legal custody of a relative. As even Father makes clear in his appellate brief, much of his argument regarding the failure to grant legal custody is a reiteration of his argument

regarding the granting of permanent custody. Consequently, this Court will review the factors set forth in R.C. 2151.414(D) in reviewing the decision of the trial court regarding the granting of permanent custody to CSB and the denial of legal custody to the paternal grandparents.

{¶14} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the personal interaction and interrelationships of the children, the wishes of the children regarding placement, the custodial history of the children, and whether there are any appropriate alternatives to permanent custody. See *In re R.G.*, 9th Dist. Nos. 24834 & 24850, 2009-Ohio-6284, at ¶11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith* (Jan. 2, 2002), 9th Dist. No. 20711, at *3. See, also, *In re Palladino*, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶24.

{¶15} The first best interest factor calls for a consideration of the personal interactions and interrelationships of the children. The two children were said to share a definite bond. They had been together their entire lives, either with their parents or in foster care. When they first came into care, the children were described by the caseworker as "withdrawn, sort of lifeless." According to her, they did not seem to know how to play with toys and did not speak. They would go with anyone and did not cry when their parents left. T.M. would scream because it was his only means of communicating.

{¶16} Developmental assessments were conducted, and each child was provided with occupational, physical, and speech therapy on a regular basis. The caseworker explained that the children have made gradual improvements. They have learned to play with toys, have started to smile, have begun eating better, and seem a little happier. At the time of the permanent custody

hearing, the caseworker said the children show affection to others and try to communicate within a limited vocabulary, but are not yet potty-trained and still do not speak very well. T.M. has stopped screaming.

{¶17} Father was given a case plan and was able to visit with the children for two months until he was incarcerated. He was also incarcerated at the time of the permanent custody hearing in February 2011. Father's criminal history includes domestic violence against Mother when she was nine months pregnant with T.M. on March 11, 2008, and the violation of a civil protection order the following day. In December 2008, Father pled guilty to burglary, escape, domestic violence, and violating a protection order, and in July 2009, he pled guilty to additional counts of domestic violence and violating a protection order. For these latter two cases, he was sentenced to a total term of incarceration of three years. He was expected to be released from prison on April 3, 2012. The guardian ad litem stated that the children have had very little contact with Father since the case began and that they have little memory of him.

{¶18} Early in the proceedings, Mother sought reunification with her children, but by the time of the permanent custody hearing, she decided to relinquish her parental rights. Mother testified that she believed it would be in the children's best interest to be adopted by a family that could love them and provide for them financially, emotionally, psychologically, and spiritually in a way that she could not. She testified that she would like to have the ability to continue to see her children, but preferred that the children be adopted by an unrelated family than be placed with the parental grandparents.

{¶19} Mother opposed placement with the paternal grandparents because she believes they repeatedly ignored Father's aggression against her while they lived in the grandparents' home. At the permanent custody hearing, Mother testified that Father would yell, scream, and

strike her in the face on a daily basis, and that the children were often present to observe that behavior. Mother explained that the abuse usually took place while the paternal grandmother was working, the paternal grandfather was in his room, and Father's two brothers were playing video games, but she believed they nevertheless knew the abuse was taking place.

{¶20} The paternal grandparents disputed this testimony and claimed that they had not observed much of the abuse that Mother says she suffered while living in their home. At the same time, the paternal grandmother admitted that her husband had told her about some of it. It is undisputed that the parents had a history of domestic violence and some of it took place in the home of the paternal grandparents.

{¶21} Moreover, in terms of the ability of the grandparents to provide for the children's care and safety, it may be important to note that the paternal grandparents claim to have been unaware of much about the troubled relationship between Mother and Father. The paternal grandmother was not aware that any problems existed between the couple before they came to live in their home. For example, she was unaware of her son's domestic violence conviction from March 2008. Also, neither of the paternal grandparents was aware of the protective order that existed between the couple while they were living together in the paternal grandparents' home prior to Father's arrest. Subsequently, the paternal grandmother testified that she believed the protective order was issued only because of verbal arguments and that her son had never been physically violent. The paternal grandfather testified that he did not understand why the children were removed from the home, although he was the one who called the police to his home at the beginning of this case.

{¶22} The paternal grandparents inquired about placement early in the proceeding, but the agency denied their request due to concerns about the conflicts in the home and the paternal

grandparents' ability to protect the children. The record reflects justification for these concerns. Father, who had a history of domestic violence and was currently incarcerated, had lived in the home with them, and another son was the subject of an arrest warrant. On at least two occasions, the paternal grandfather called the police to his home because of violent incidents involving his sons.

{¶23} After the other potential relatives withdrew from consideration, Father requested consideration of the paternal grandparents as custodians by filing a motion for legal custody to them. Their home was reassessed by CSB shortly before the permanent custody hearing. Both grandparents testified that they would like to have custody of the children and expressed concern for them. The paternal grandmother testified that she loved the children and that she was financially and otherwise able to provide for them. Both of the grandparents claimed that they would bar Father from their home upon his release from prison, if the court so ordered.

{¶24} The agency recommended against granting custody to the grandparents. In part, the agency felt their relationship with the children was not strong enough. According to the caseworker, the paternal grandfather had not seen the children for years, and the paternal grandmother had only minimal contact with them, generally during visits at her sister's home. For his part, the paternal grandfather stated that he last saw the children shortly after Christmas. He did not report additional visits. The paternal grandmother testified that she joined her son at one or two visits before he was incarcerated and then saw the children four to six times during visits held at her sister's home. In addition, the record demonstrates that the paternal grandparents did not volunteer themselves to assume custody at a meeting held in August 2010 convened to solicit relative placement options, and that they failed to attend any juvenile court proceedings until the permanent custody hearing in February 2011.

{¶25} Father argues that the paternal grandparents were not given a sufficient opportunity to visit with the children as they were denied regular visitation early in the proceedings. The caseworker explained, through her testimony, that independent visits by the paternal grandparents were denied because Father had accompanied the paternal grandmother on a few early visits, and the agency was concerned that a reminder of his volatile relationship with Mother could cause the children to regress.

{¶26} In addition to questions about the paternal grandparents' ability to provide for the children's safety, there were reasonable concerns about their ability to provide care for the children because of time and health considerations. This is particularly true because the children are very young, very active, and have multiple therapy appointments per week. The paternal grandmother was working two or three jobs, totaling 50-60 hours a week, and the paternal grandfather has health problems, including diabetes and kidney failure. He typically leaves the home for dialysis treatment three times a week at 5:00 a.m. and returns at 9:00 a.m. Although the paternal grandfather testified that his wife was in the home at that time, she testified that she started work at 8:00 a.m. at least three days a week. The paternal grandfather is licensed to drive a car. He generally uses a cane, walker, or wheelchair to get around the house. He is no longer employed, but was previously a chef and claims that he could prepare meals for the children when his wife is not present. While the paternal aunt speculated that the paternal grandmother planned to quit her job, there was no testimony by the grandparents on this subject and no explanation of how they would manage financially under that circumstance.

{¶27} Father also disputed the trial court finding that the paternal grandparents did not appreciate the severity of the children's delays. In making this argument, he noted that the observations of the paternal grandparents were largely based on the children's behaviors at the

time of their removal when they were quite young and some delays were not yet well-defined. Even though the children were young, the caseworker's testimony that the children were "sort of lifeless" and did not know how to play with toys at that time should have signaled a concern in the grandparents. Later, according to the guardian ad litem, T-G.M. could not count to three or communicate more than three words by the age of four. These facts suggest a degree of delay that should have aroused the attention of the paternal grandparents. The guardian ad litem also noted that when the paternal grandfather was asked how he could manage the children while the paternal grandmother was working, he indicated that "we'll be just fine" and pointed to a large-screened television. The evidence supports the trial court finding that the paternal grandparents did not display a comprehension of the children's special needs and the capacity to provide them with necessary and appropriate care.

{¶28} The second best interest factor concerns the children's wishes about where they should live. As these children were not of sufficient maturity to independently express such a wish, the guardian ad litem recommended permanent custody on their behalf. While advocating an open adoption with some continued contact with Mother, Father, and the maternal grandmother, she nevertheless believed that permanent custody was in the best interest of the children.

{¶29} The third best interest factor calls for consideration of the custodial history of the children. From the time of their birth, the children resided with their parents, first in their own apartment and later in the home of the paternal grandparents. The family was residing with the paternal grandparents when the children were removed by the police at the inception of this case. At that time, T-G.M. was two years old and T.M. was one year old. The children lived with the same foster parents for the next two years. As pointed out by Father, much time was devoted to

efforts to place the children with the maternal grandparents and a paternal aunt. This does not mean, however, that insufficient effort was devoted to placing the children with the paternal grandparents. Evidence regarding concerns with such a placement is included above. Although Father disagrees with the decision, he has not demonstrated legal error in regard to efforts made in investigating or considering the possibility of a placement with the paternal grandparents.

{¶30} Fourth, there was evidence before the trial court that supported the determination that the children's need for a legally secure permanent placement could only be met by a grant of permanent custody to the agency.

{¶31} Accordingly, upon this record, this Court concludes that the decision to grant permanent custody of the children to CSB and terminate the parental rights of Father was not against the weight of the evidence. Moreover, there was clear and convincing evidence before the trial court from which it could conclude that permanent custody was in the children's best interest. Consequently, the trial court did not err in denying the motion for legal custody to the paternal grandparents, in terminating Father's parental rights, and in placing T-G.M. and T.M. in the permanent custody of CSB. Father's two assignments of error are overruled.

## III.

{¶32} Father's two assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

CARR, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

DEREK CEK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

ALEXANDRA HULL, Attorney at Law, for Appellee.

LINDA BENNETT, Attorney at Law, for Guardian ad Litem.