[Cite as *In re D.K.*, 2021-Ohio-682.]

STATE OF OHIO            )          IN THE COURT OF APPEALS
                         )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT         )

IN RE D.K.                          C.A. No.    29857


                                    APPEAL FROM JUDGMENT
                                    ENTERED IN THE
                                    COURT OF COMMON PLEAS
                                    COUNTY OF SUMMIT, OHIO
                                    CASE No.    DN 18-10-1034

DECISION AND JOURNAL ENTRY

Dated: March 10, 2021

CARR, Judge.

{¶1}     Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her child in the permanent custody of Summit County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

{¶2}     Mother is the biological mother of D.K. (d.o.b. 10/19/16). Paternity has been established. Father did not participate in the proceedings below and does not challenge the judgment on appeal.

{¶3}     Shortly before the child's second birthday, CSB filed a complaint alleging that D.K. was a dependent child. The agency sought protective supervision based on concerns that Mother and Father were using drugs, frequently fighting, and leaving the child with her elderly great grandmother who had limited mobility, no access to a car or phone, and who was suspected of being in the early stages of dementia. CSB also sought an order of access to the home that the

parents shared with the child's great grandmother. The juvenile court granted protective supervision and issued an order of access so that the agency could enter the home to check on the child's welfare.

{¶4} Shortly thereafter, CSB filed an amended complaint, seeking an emergency order of temporary custody based on its inability to have contact with Mother, its discovery of an outstanding warrant for Father's arrest, and the child's remaining in the care of an elderly relative with no access to transportation or a phone. The juvenile court granted emergency temporary custody to the agency.

{¶5} After the child's adjudication, D.K. was placed in the temporary custody of CSB. The juvenile court adopted the agency's case plan which (1) required Mother and Father, whose whereabouts were unknown, to contact CSB to express their interest in visitation, custody, and participation in the case plan; and (2) required the child's caregiver to provide for all of D.K.'s basic needs. Although the child's maternal grandmother ("Grandmother") expressed an interest in providing a home for the child, D.K. was placed in a foster home when CSB could not approve Grandmother's home for placement. Specifically, the condition of Grandmother's home presented an unsafe environment due to extreme clutter, items placed too close to the furnace and water heater, and collections of boxes and other items preventing entry to any of the home's bedrooms. In addition, Grandmother's collections of sundry knickknacks were displayed on tables and shelves accessible to a young child who might pull the items down on top of her, causing injury. Because CSB wished to place the child in the least restrictive environment possible, the agency advised Grandmother of its concerns and explained how she could remedy the conditions in her home so that D.K. could be placed with her.

{¶6} As the case progressed, Father did not participate in any proceedings or have any contact with CSB, the child, or the child's guardian ad litem. Mother had limited involvement and contact with D.K. Grandmother attended visits that CSB scheduled for Mother and the child, even when Mother did not appear. When Mother was finally removed from the visitation schedule due to her repeated failures to appear, the agency reduced Grandmother's visits with the child to once a month pursuant to agency policy. At that point, Grandmother stopped appearing for visits. In the meantime, despite encouragement and reminders from CSB regarding how to remedy the conditions in her home, Grandmother did not contact the agency to schedule a home visit to demonstrate that her home was appropriate for the child.

{¶7} One year after it filed its initial complaint, CSB filed a motion for permanent custody. The agency alleged that Mother and Father had abandoned the child; alternatively, that the child could not or should not be placed with either parent within a reasonable time; and that an award of permanent custody was in the child's best interest. The agency further filed an amended case plan, adding a substance abuse objective for Mother.

{¶8} Five months later, Grandmother filed pro se motions to intervene and for legal custody of D.K. The juvenile court denied intervention and further asserted that it would not consider Grandmother's motion for legal custody unless a party filed such a motion. Thereafter, Mother filed a motion for legal custody to Grandmother.

{¶9} The final dispositional hearing was continued multiple times on Mother's request. The hearing commenced one year after the agency filed its motion. At the conclusion of the hearing, the juvenile court granted CSB's motion for permanent custody, denied all other dispositional motions, and terminated Mother's and Father's parental rights. Mother filed a timely appeal in which she raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN DENYING MOTHER'S MOTION FOR LEGAL CUSTODY OF D.K. TO MATERNAL GRANDMOTHER AND IN FINDING THAT IT WAS IN D.K.'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF CSB. THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Mother argues that the juvenile court's award of permanent custody of D.K. to CSB was against the manifest weight of the evidence. This Court disagrees.

{¶11} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶12} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). The best interest factors include: the interaction and

interrelationships of the child, the wishes of the child, the custodial history of the child, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} Mother does not challenge the juvenile court's first-prong findings that Father abandoned the child and that the child could not or should not be placed with either parent. As to Mother, the juvenile court specifically found that Mother had failed to remedy the conditions which led to D.K.'s removal. Our review of the record supports the juvenile court's findings as to the first prong of the permanent custody test. Father had not had any contact with the child throughout the entire two-year pendency of the case. Mother failed to engage in substance abuse treatment. Moreover, she admitted that she could not care for the child at the time of the hearing. Accordingly, the juvenile court's finding that CSB had proved its first-prong allegations was not against the manifest weight of the evidence.

{¶14} In challenging the trial court's finding that an award of permanent custody was in the child's best interest, Mother focuses her argument on the court's denial of her motion for legal custody to Grandmother. Specifically, she argues that the evidence demonstrated that an award of legal custody to Grandmother was in D.K.'s best interest. Mother's argument is not well taken.

{¶15} This Court has previously addressed a similar argument in *In re S.P.*, 9th Dist. Summit No. 27138, 2014-Ohio-1211, ¶ 10, where we wrote:

Because the trial court's decision whether to place the child[ ] in the legal custody of Grandmother was also based on the best interest of the child[ ], "this Court typically conducts a single 'best interest' review of the trial court's decision to place the child[ ] in the permanent custody of the agency rather that in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10, quoting *In re T-G.M.*, 9th Dist. Summit No. 25858, 2011-Ohio-3940, ¶ 13. If permanent custody is in the child[ ]'s best interest, legal custody to Grandmother necessarily is not. "'Consequently, this Court will review the factors set forth in R.C. 2151.414(D) in reviewing the [best interest] decision of the trial court * * *'" *Id*.

Custodial history of the child

{¶16} D.K. had just turned two years old when she was removed from Mother's care. Prior to that time, Mother frequently left the child in the care of others, including the child's elderly great grandmother. Once D.K. was removed from her home, she spent the next two years in CSB's custody. Accordingly, the child spent half of her young life in foster homes, outside of her parents' custody.

Interactions and interrelationships of the child

{¶17} D.K. has had no contact with Father. Mother visited with the child approximately seven times during the two-year pendency of the case. Due to Mother's limited contact with D.K., the child has no discernible bond with Mother. D.K. last saw Mother at a visit approximately seven months prior to the permanent custody hearing.

{¶18} Grandmother accompanied Mother at every visit Mother attended. In addition, Grandmother attended many visits scheduled for Mother in Mother's absence for several months. When Mother's visits were eventually terminated due to her failure to appear for them, agency policy limited Grandmother's visits with the child to once a month for non-parent family members. At that time, however, Grandmother "fell off" with her scheduled visits with D.K., according to the caseworker. When Grandmother did have contact with the child, she was appropriate and showed great love for D.K. The child seemed familiar with Grandmother but did not appear to be

closely bonded with her. During visits, Grandmother frequently got distracted from interacting with the child and instead wanted to discuss how D.K. could be placed in her home. The caseworker would redirect Grandmother to interact with the child and simply encouraged her to remedy the cluttered conditions in her home.

{¶19} D.K. lived in her first foster home for a year and a half. The foster parents had three other children in the home, including two special needs children around the same age as D.K. While D.K. was closely bonded with the foster parents, she began to act out in the environment where she had to share the attention of the foster family with other children. D.K.'s special needs and behavioral issues, coupled with the needs of three other children in the foster home, presented an unmanageable situation for the foster parents. D.K. was then placed in a therapeutic foster home where there were no other children. Since that move, the child has bonded closely with her current foster parents, and her behavior has greatly improved.

Child's wishes

{¶20} At four years old, and lacking verbal skills, D.K. is unable to express her wishes regarding custody. The guardian ad litem recommended permanent custody in the child's best interest.

Child's need for permanence

{¶21} D.K. is a young child with special needs. She has recently been diagnosed with autism. At the age of four years, she has a verbal vocabulary of between 10 and 15 words. She communicates primarily through gestures which her foster parents understand. D.K. requires physical, occupational, and speech therapies every week. Her foster parents, who wish to adopt her, ensure that the child attends all scheduled therapies and appointments. Grandmother knows that D.K. is on the autism spectrum, but she does not acknowledge the extent of the treatment the

child will require. The guardian ad litem testified, however, that D.K. will require life-long therapies and in-home practice and reinforcement to develop coping strategies necessary to function and thrive.

{¶22} Father is absent from the child's life and unable to provide a home environment for her. Mother suffers from substance abuse issues which she admits preclude her from seeking custody of the child.

{¶23} Grandmother has expressed the desire for placement and custody of D.K. since her removal from Mother and Father. In fact, Grandmother was present in the great grandmother's home when the agency removed the child. Grandmother asked the caseworker to follow her to her home a block away to see if it was an appropriate environment for the child. The caseworker agreed. Upon viewing the condition of the home, however, the caseworker informed Grandmother that she could not leave D.K. in that environment.

{¶24} A kinship caseworker observed Grandmother's home and pointed out multiple concerns. The finished basement, which contains two bedrooms, the furnace, and a water heater, was so cluttered that it was difficult to navigate throughout, and impossible to exit quickly in an emergency. Items, including numerous holiday yard inflatables, surrounded the furnace and water heater and were placed within an inch of those fixtures. The caseworker told Grandmother that those items presented a fire hazard. On the main floor, the living room was clean, but contained many knickknacks which a young child could easily knock down on herself. The three bedrooms on the main floor posed significant concerns, as they were filled with clothing, boxes, and other items to the extent that it was not possible to enter or even see if there were beds therein. Further, because of the extreme clutter, the caseworker could not assess for hidden safety issues like exposed electrical wiring. The agency worker explained what Grandmother needed to do to

remedy the conditions in her home so that she might be considered as a viable placement option for the child. Grandmother acknowledged the concerns and told the caseworker that she would contact her after she decluttered the home.

{¶25} During the entire next year, Grandmother failed to contact CSB about the condition of her home. When she did contact the agency, the kinship worker scheduled a visit to assess Grandmother's home in mid-October 2019. Grandmother, however, canceled that appointment at the last minute. Although CSB rescheduled for a week later, Grandmother also canceled that appointment immediately beforehand. When she did not hear from Grandmother, the kinship assessor called Grandmother in February 2020. Grandmother canceled the home visits scheduled on both February 18 and 25, 2020, on the days of those appointments.

{¶26} Grandmother contacted the agency to again reschedule an appointment for the kinship assessor to view her home in March 2020. Because of the Covid-19 pandemic, however, CSB was not able to schedule any home visits at that time. Nevertheless, the assessor told Grandmother to send pictures of the current state of her home in lieu of the assessor's in-person inspection. While Grandmother sent some pictures of the basement, living room, and kitchen, she did not send pictures of any of the bedrooms. While the pictures sent did not indicate any safety hazards, CSB still had no way to determine whether the child would have a clean, safe, and uncluttered place to sleep. In the absence of verification that Grandmother had remedied the inappropriate conditions in her home, the agency could not proceed with the assessment process to determine whether Grandmother would be a suitable placement option for the child.

{¶27} The foster parents have consistently provided a safe and stable environment for the child. They enrolled D.K. in preschool with a teacher with a strong background in addressing the

needs of children on the autism spectrum. They worked with the child to address her behavioral issues and have ensured that D.K. receives the necessary services to allow her to thrive.

{¶28} Both the caseworker and the guardian ad litem expressed the concern that Grandmother's failure to address the issues standing in the way of her assessment for placement in a timely manner indicated that she may delay addressing the child's special needs. Both professionals were also concerned by the child's lack of a bond with Grandmother due to their limited contact which existed in large part because of Grandmother's failure to remedy her home conditions. Had Grandmother remedied those deficiencies, she might have been assessed, determined to be appropriate, and had home visits or even placement of the child so that a bond could develop. Unfortunately, Grandmother's delay in addressing her home conditions during the two-year pendency of the case negatively impacted Mother's ability to show that Grandmother would be an appropriate custodian for the child.

{¶29} The guardian ad litem recommended permanent custody in the best interest of the child. She opined that neither parent nor Grandmother could provide the child with the safe, stable, and consistent home environment necessary to meet D.K.'s basic and special needs. On the other hand, she opined that the foster parents who wished to adopt the child could and would provide that type of environment for D.K. The agency caseworker testified that she investigated both maternal and paternal family members for placement, but none were appropriate or able to receive placement.

R.C. 2151.414(E)(7)-(11) factors

{¶30} Father has abandoned the child pursuant to R.C. 2151.414(E)(10), as he has not had any contact with her throughout the case. No other subsection (E) factors are implicated.

Conclusion

{¶31}  Based on a thorough review of the record, this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest miscarriage of justice by terminating the parents' parental rights and awarding permanent custody to CSB.  Father abandoned the child.  Mother had very little contact with the child.  Moreover, Mother admitted that she had ongoing substance abuse issues and could not provide an appropriate home for D.K.  Mother supported an award of legal custody to Grandmother.  Although Grandmother expressed interest in obtaining placement and legal custody of the child from the beginning of the case, her home could not be approved by CSB.  Grandmother never demonstrated to the agency that she had remedied the unsafe and extremely cluttered conditions in her home.  Despite encouragement by the caseworker, kinship worker, and guardian ad litem, Grandmother did not permit access to her home for inspection.  Neither did she provide the requested photographs of all areas of her home to show that she had removed all clutter so that an agency caseworker could visit to further inspect the home for safety hazards which might have been hidden from view due to the many items filling the home.

{¶32}  The child has no significant relationship with either parent.  She is not bonded with Grandmother.  The current foster parents provide a safe and stable home environment for D.K., and they wish to adopt the child.  The child evidences a strong bond with her foster parents.  Significantly, the foster parents are able and willing to address all the child's basic and special needs.  Under these circumstances, the juvenile court's finding that it was in the child's best interest to terminate parental rights and award permanent custody to CSB is supported by clear and convincing evidence.  As such, an award of legal custody to Grandmother was not in the child's

best interest. *See In re S.P.* at ¶ 10. Accordingly, the judgment is not against the manifest weight of the evidence. Mother's assignment of error is overruled.

### III.

{¶33} Mother's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

SHUBHRA N. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

HOLLY FARAH, Guardian ad Litem.