[Cite as *In re C.T.*, 2023-Ohio-3681.]

STATE OF OHIO   )    IN THE COURT OF APPEALS
        )ss:    NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE  )

IN RE: C.T.          C.A. No.  23AP0006



                APPEAL FROM JUDGMENT
                ENTERED IN THE
                COURT OF COMMON PLEAS
                COUNTY OF WAYNE, OHIO
                CASE No.  2020 JUV-C 000983

DECISION AND JOURNAL ENTRY

Dated: October 10, 2023

---

SUTTON, Presiding Judge.

**{¶1}** Appellant Father appeals the judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated his parental rights and awarded permanent custody of his child to Wayne County Children Services Board ("CSB" or "the agency"). This Court affirms.

I.

**{¶2}** Mother and Father are the biological parents of C.T., born December 2, 2019. The parents were never married. Although Father was aware of Mother's pregnancy and that she had given birth, he did not seek to establish paternity until eight months after CSB became involved with the child. At all times during the case below, Father resided in Michigan.

**{¶3}** When C.T. was a year old, Mother was involuntarily admitted to a hospital psychiatric ward after claiming she had recently experienced significant trauma. CSB learned that Mother had a child whom she had left with three men who could not continue to care for him. The agency removed the child and filed a complaint alleging his neglect and dependency. After

hearings, the juvenile court adjudicated C.T. neglected and dependent, placed him in the temporary custody of CSB, and adopted the agency's case plan as an order. As the child's father remained unknown at that time, there were no case plan objectives for Father.

{¶4} CSB contacted the child's alleged father and sought an order for paternity testing. Three review hearings later, the agency was able to report that Father was willing to submit to genetic testing and that he wished to pursue placement of the child. Test results established Father's paternity of C.T., and CSB added Father to the case plan. His sole objective was to cooperate and comply with the Interstate Compact for the Placement of Children ("ICPC") through the Michigan child welfare agency where Father lived and apprise the caseworker of any needs or barriers to placement.

{¶5} Ten months into the case, CSB moved for a first six-month extension of temporary custody. Although Mother had had no contact with the agency or engaged in any case plan services, CSB asserted that Father had established paternity, was visiting consistently with the child via Zoom, and was cooperating with the ICPC process. Accordingly, the agency believed that an extension of temporary custody to allow Father to work toward reunification was in the best interest of the child. The juvenile court granted the extension. In addition, because Father had become unemployed, the trial court granted his request to reduce the amount of his child support obligation.

{¶6} The Michigan child welfare agency approved Father's ICPC home study. In November and December 2021, Father submitted to drug screens during his in-person visits with the child. He tested positive for marijuana and cocaine on all three tests and positive for fentanyl on one. Thereafter, CSB added a case plan objective requiring Father to obtain a substance use assessment, follow all recommendations, and submit to random drug screens. Because of Father's

positive screens for cocaine and fentanyl, combined with his failure to disclose his drug use during the ICPC process, Michigan rescinded its approval of Father for placement of the child.

{¶7} Mother began to engage in case plan services. Father obtained a substance use assessment and engaged in the recommended intensive outpatient treatment. CSB moved for a second six-month extension of temporary custody based on the parents' case plan progress. Despite concerns regarding Mother's and Father's engagement in services, the juvenile court granted the second extension.

{¶8} Because Father lived three hours away from the agency's visitation center, CSB allowed him to visit virtually by Zoom with the child every other week. On alternate weeks, Father was provided the opportunity to visit in person with C.T. at the agency. CSB routinely screens parents for drug use at in-person visits. After Father's third positive drug screen in late December 2021, he did not appear for in-person visits again until June 2022.

{¶9} Close to 20 months into the case, CSB filed a motion for permanent custody. The agency alleged that the child had been in its temporary custody in excess of 12 of the prior 22 months, that Mother had abandoned the child, and that Father had made no good faith efforts to address his substance abuse issues or materially change his circumstances since the revocation of his ICPC approval. Father moved for legal custody. He later amended his motion to alternatively request legal custody of the child to one of two couples he identified. Both couples lived outside of Ohio.

{¶10} At the final dispositional hearing, Mother attempted to waive her rights and stipulate to an award of permanent custody. The juvenile court rejected her waiver, finding it was not made knowingly, voluntarily, and intelligently. The matter proceeded to a three-day hearing, after which the juvenile court issued a judgment granting CSB's motion for permanent custody,

terminating Mother's and Father's parental rights, and denying all other dispositional motions. Father filed a timely appeal and raises two assignments of error for review. This Court rearranges the assignments of error to facilitate discussion.

II.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT'S DECISION TO DENY [FATHER'S] AMENDED MOTION FOR LEGAL CUSTODY AND GRANT PERMANENT CUSTODY TO CSB WAS CONTRARY TO THE BEST INTERESTS OF THE CHILD AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶11} Father argues that the juvenile court's judgment awarding permanent custody of C.T. to CSB is against the manifest weight of the evidence. This Court disagrees.

{¶12} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶13} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶14} The juvenile court found that CSB proved the first prong of the permanent custody test by demonstrating that the child had been in the temporary custody of the agency for at least 12 of the prior 22 consecutive months. Father does not challenge that finding which is fully supported by the record. He solely challenges the trial court's finding that permanent custody is in the best interest of the child.

{¶15} When a juvenile court grants an agency's motion for permanent custody in lieu of any pending motion for legal custody, this Court applies the following test:

> Because the trial court's decision whether to place the children in the legal custody of [any person] was also based on the best interest of the children, "this Court typically conducts a single 'best interest' review of the trial court's decision to place the children in the permanent custody of the agency rather than in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10, quoting *In re T-G.M.*, 9th Dist. Summit No. 25858, 2011-Ohio-3940, ¶ 13. If permanent custody is in the children's best interest, legal custody to [any other person] necessarily is not. "'Consequently, this Court will review the factors set forth in R.C. 2151.414(D) in reviewing the [best interest] decision of the trial court * * *'" *Id*.

*In re S.P.*, 9th Dist. Summit No. 27138, 2014-Ohio-1211, ¶ 10.

{¶16} When determining by clear and convincing evidence whether permanent custody is in the child's best interest, the juvenile court must consider the interactions and interrelationships of the child, the child's wishes and custodial history, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be

established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶17} C.T. has never been in the legal or physical custody of Father. The child was in Mother's legal custody until CSB removed him around his first birthday. C.T. was three years old at the time of the permanent custody hearing and had spent two years in a foster home within the agency's temporary custody. Father did not express an interest in the child until he was over a year and a half old.

{¶18} C.T. has no bond or relationship with Mother, as she only visited the child one time during the two-year case. Once paternity was established, Father visited fairly consistently with C.T. After visiting virtually for two months, Father began to exercise biweekly in-person visits. After testing positive for drugs three visits in a row, Father did not exercise his scheduled in-person visits for six months. The caseworker, guardian ad litem, and both agency visitation specialists testified that Father was always appropriate during both in-person and virtual visits, engaging the very young child effectively. The guardian ad litem was particularly impressed by Father's ability to hold the toddler's attention during virtual visits. C.T. referred to Father as "dad" and the two shared an apparent bond.

{¶19} The child's foster mother testified that C.T. is comfortable in the foster home shared also by the foster father and the foster parents' four older biological children. Although the foster parents care for the child, they are not planning to pursue adoption, although they are willing to consider it. Their preference is to remain foster care providers for children in the agency's custody.

{¶20} C.T. has no special needs and is developmentally on par with a typical three-year-old. Given his young age, he is not able to self-protect from danger and requires caregivers who are able to provide a safe and stable environment for him. Because the child is so young, the

guardian ad litem made a recommendation for custody in the child's best interest. Although she recognized a genuine father-child bond, the guardian ad litem opined that an award of permanent custody would be in C.T.'s best interest. She emphasized concerns, to be more fully addressed later in this opinion, that Father had not sufficiently addressed his substance use issues, which precluded him from graduating to unsupervised and expanded visitation and assuming greater responsibility for the child's care.

{¶21} After spending two thirds of his life in agency custody, C.T. deserves permanency. Mother failed to engage in her designated case plan services throughout much of the case and abandoned the child by failing to maintain a relationship with him through visitation. She is not a viable option to provide permanency for the child.

{¶22} Father did nothing to establish a relationship with C.T. after he was born until CSB contacted him after initiating this dependency/neglect action. He did not get involved until the case had been pending for eight months. While his physical home was appropriate, Father led the Michigan child welfare agency that conducted his ICPC evaluation to believe that there were no issues which would pose a danger to the child. In fact, however, Father had a history of abusing opiates. Three positive drug screens two months into Father's involvement in the case, coupled with his failure to disclose a substance abuse issue, compelled the Michigan agency to revoke its approval of Father as a placement option for the child.

{¶23} CSB added a substance use case plan objective for Father shortly after his first positive drug screen. Notwithstanding three consecutive positive screens for substances including cocaine and fentanyl, Father adamantly denied using those drugs. He admitted to daily marijuana use but explained that marijuana for recreational use is legal in his home state of Michigan. In addition, Father testified that he has a medical marijuana card. He testified that he confines his

smoking marijuana to a closet in his home, but never when his daughter by another woman is visiting a couple times a week. Father did not explain when and where he might smoke marijuana if C.T. were returned to him and in his home on a daily basis.

{¶24} Father obtained a drug assessment which recommended his participation in intensive outpatient treatment ("IOP"). The report of his assessment indicated that Father did not disclose the drug use which resulted in his two positive screens in December 2021. His substance abuse therapist testified that if she knew Father was using drugs around the time of his assessment, she would have recommended him for a detoxification program and residential treatment.

{¶25} Father completed IOP via telehealth through Hegira Health ("Hegira"). While the program was designed for completion within five weeks comprised of thrice weekly three-hour sessions, Father took 11 weeks to complete it due to regularly missed sessions. Due to health protocols in effect at the time, the IOP program had no drug screening component. Accordingly, Hegira was unable to verify Father's alleged sobriety.

{¶26} Father was engaged in a medically assisted drug treatment ("MAT") program in the office of Dr. Arun Gupta who prescribed Suboxone to address Father's opioid cravings. Father periodically provided urine samples for drug screening at Dr. Gupta's office. Those results were never sent to Hegira. Dr. Gupta testified that Father's drug screens obtained during office hours were generally positive for substance use. However, Father would come into the office after hours when his fiancée, who worked there, was the only one present. Father would allegedly provide a new urine sample which his fiancée would send to an outside lab for testing. Those results were always negative for all substances except marijuana and Suboxone which Father legally used. Based on the after-hours test results, Father's fiancée asked the doctor to write a letter validating Father's negative drug screens. Dr. Gupta testified that he believed something nefarious was afoot

because while Father's screens taken during office hours were all positive for substance use, his record now indicated that Father was clean, and Father's fiancée was seeking validation of those new results.

{¶27}   In addition to the disparity in the results of Father's various drug screens in Dr. Gupta's records, the CSB caseworker received some unusual correspondence from the doctor's office.   For example, while the caseworker received a fax including lab results outside of the normal screening done in Dr. Gupta's office, a glowing report of Father's progress both within the MAT program and treatment outside the doctor's office, and a certificate of completion for a program not affiliated with Dr. Gupta, the doctor's records keeper testified that those documents had not been sent to CSB with Dr. Gupta's authorization.   When the records keeper notified Dr. Gupta of the irregularities and unauthorized transmissions, the doctor terminated Father as a patient.

{¶28}   After Father completed IOP at Hegira, his therapist recommended that he begin individual outpatient counseling for substance abuse within 30 days.   When Father had not initiated counseling five months later, his therapist reached out to him to see if he was willing to do so. Because of the passage of time since Father's last engagement in services, his therapist scheduled him for another assessment.   Father did not appear on the scheduled date but ultimately obtained his new assessment three weeks later.   He finally began individual substance abuse counseling two months before the permanent custody hearing.   His therapist testified that she expects that Father's counseling would need to continue at least another six months.

{¶29}   Father was required to submit to drug screens as part of his outpatient treatment. Due to funding limits, Hegira only paid for two screens per month.   Father's therapist testified that

she generally sent Father for drug screening after one of their counseling sessions. At that time, Father's screens were consistently positive only for marijuana and Suboxone.

{¶30} Dr. Jerome "Pete" Reed reviews and certifies toxicology reports for Forensic Fluids Laboratories. The juvenile court certified Dr. Reed as an expert in the areas of testing for drugs of abuse and testing methodology. Forensic Fluids performed drug testing for both Mother and Father.

{¶31} Dr. Reed explained the best practice to assure abstinence in addicts. He testified that it is first necessary to establish a baseline for sobriety which requires random screening at least twice a week for a few weeks. Once sobriety is established under those conditions, only then would less frequent screenings with negative results support a finding of sustained sobriety.

{¶32} Dr. Reed further testified regarding the window of detection for various screening methods. Oral swabs detect substances from 20 minutes after use until approximately three days later. Urine screens detect those same substances from a few hours after consumption until approximately five days later. Accordingly, Dr. Reed testified that requiring weekly or biweekly screens allows a drug user to "game the system" and avoid detection.

{¶33} While Father emphasized that he submitted to a court-ordered hair follicle test which showed only his use of marijuana and Suboxone, Dr. Reed testified that hair follicle testing is ineffective to show sporadic or occasional use. Because that method of testing only detects substances which have ultimately collected and settled within the hair follicles, it will only give positive results for drugs which a person uses chronically and consistently over time. Specifically, Dr. Reed testified that hair follicle testing identifies substances used daily or every other day for a consistent period of six to seven months. Accordingly, Father's hair follicle test would not have

detected any use of opiates, cocaine, or other drugs he might have consumed occasionally, even if recently.

{¶34} The caseworker testified regarding her ongoing concern that Father had not adequately addressed his substance abuse issues. Father has a known history of drug use and never established a verifiable and sustained period of sobriety. He admitted an addiction to opiates and testified that his current MAT provider believes he should be on Suboxone at least another year based on his prior severe cravings. When questioned by the court, Father could not identify his sobriety date.

{¶35} Father's fentanyl use caused the caseworker particular concern because the substance is very dangerous in small amounts, it can be absorbed through the skin, and young children like C.T. are very susceptible to its effects. Of additional concern was that, while Father eventually admitted he had used cocaine once early on, he did not admit that he used it on multiple occasions as his drug screens throughout November and December 2021 indicated. Moreover, Father adamantly denied having used fentanyl. He surmised that it must have unknowingly been in the cocaine he ingested once at a party. Even if true, Father's indiscriminate use of party drugs which might be tainted with other dangerous substances would put the child at risk for exposure.

{¶36} The caseworker and guardian ad litem expressed concern regarding Father's dishonesty regarding his substance abuse throughout the case. Father admitted during his testimony that he was dishonest with the caseworker and his therapist regarding his drug use. Even at the hearing, he took no accountability for his two positive cocaine screens in December 2021, because he would only admit to having used cocaine at a party in November, which accounted for his November 19, 2021 positive screen. Notwithstanding Dr. Gupta's and his office records keeper's testimony to the contrary, Father still maintained at the hearing that he had not asked the

doctor to lie for him and did not cause unauthorized documents to be sent from Dr. Gupta's office to the caseworker. More significant still, the Michigan child welfare agency revoked its approval of Father's home study expressly because of his dishonesty surrounding his substance use.

{¶37} While not a specific case plan objective, the caseworker testified that CSB expects parents to be able to meet the basic needs of their children. Father was unemployed throughout most of the case. He testified that he derives income from selling collectible cards online and that he recently obtained employment working in a marijuana dispensary. The juvenile court admitted three months' worth of recent pay stubs for Father, evidencing a total gross income of almost $6,200. He asserted that he had quit an earlier job because he was depressed, although he did not elaborate.

{¶38} Father's physical home is adequate for the child. He lives with his fiancée who facilitated Father's after-hours drug screens in Dr. Gupta's office. C.T. has never met Father's fiancée. The child has never visited Father's home. Father does not have a driver's license but admitted to driving illegally on a regular basis.

{¶39} On appeal, Father argues that there were viable alternatives to permanent custody. Three months after CSB filed its motion for permanent custody, Father amended his motion for legal custody to alternatively request legal custody to third persons, specifically two out-of-state couples with unknown affiliations to the child. Father admitted that he had never met those four people. Moreover, C.T. had never met them. CSB requested ICPC home studies on both couples. Those assessments remained pending at the time of the hearing. As Father had not submitted the statutorily required statements of understanding for legal custody from his proposed custodians, the juvenile court could not have granted legal custody to those third persons. *See* R.C. 2151.353(A)(3).

{¶40} Based on a thorough review of the record, this Court concludes that this is not the exceptional case in which the trier of fact clearly lost its way and committed a manifest injustice by awarding permanent custody of C.T. to CSB. Clear and convincing evidence established that Mother was not a viable custodial option for the child. While Father and C.T. share a bond and Father interacted appropriately with the child, Father failed to adequately address his substance abuse issues. He was never fully honest about his use of illegal substances, even with the service providers capable of assisting him in attaining sobriety. The caseworker and guardian ad litem were concerned by Father's ongoing dishonesty and the record bears out those concerns. Accordingly, while Father's most recent drug screens were only positive for marijuana (legal in Michigan) and Suboxone, he never established a verifiable period of sobriety.

{¶41} Father failed to appear for in-person visits for approximately six consecutive months, thereby avoiding the agency's concomitant drug screens. His actions in collaboration with his fiancée cast doubts on the accuracy of any negative drug screens on record in Dr. Gupta's office. Father's participation in drug treatment services was inconsistent, and his drug screens were too infrequent to verify that he had resolved his issues with opiates and cocaine. Under the circumstances, CSB demonstrated that ongoing concerns regarding Father's substance use placed the child at risk of exposure to drugs, as well as a parent under the influence of drugs. Accordingly, the juvenile court's finding that it was in the child's best interest to terminate parental rights and award permanent custody to the agency is supported by clear and convincing evidence. As such, an award of legal custody to Father or either of the two couples he proposed in the alternative necessarily was not in the child's best interest. *See In re S.P.* at ¶ 10. Therefore, the judgment is not against the manifest weight of the evidence. Father's second assignment of error is overruled.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT'S DECISION THAT IT IS "PROHIBITED UNDER THE LAW TO AWARD LEGAL CUSTODY OF THE CHILD TO FATHER" IS PLAIN ERROR.

**{¶42}** Father argues that the juvenile court committed plain error by finding that it was prohibited by law from granting legal custody to Father because Michigan did not approve him for placement under the ICPC. This Court disagrees.

> In the criminal context, plain error does not exist unless it can be said that but for the error, the outcome of the trial would have been different and that reversal is necessary to prevent a manifest miscarriage of justice. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, ¶ 57. The civil plain error standard may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

(Internal quotations omitted.) *In re S.G.*, 9th Dist. Summit No. 27428, 2015-Ohio-2503, ¶ 11. This Court has not determined to date whether the criminal or civil plain error standard applies in cases involving dependent, neglected, and/or abused children. *In re K.J.*, 9th Dist. Summit No. 29149, 2019-Ohio-123, ¶ 11. We decline to make that determination here, as Father cannot prevail under either standard.

**{¶43}** This Court does not read the juvenile court's judgment to conclude that it could not award legal custody to Father only because the Michigan child welfare agency had not approved his ICPC home study. In fact, the juvenile court considered the statutory best interest factors and engaged in appropriate reasoning in determining that an award of permanent custody was in C.T.'s best interest. Nevertheless, assuming without deciding that the juvenile court erred when writing that it was "prohibited under the law" from awarding legal custody to Father, any error was harmless. As this Court concluded in relation to Father's second assignment of error, CSB

presented clear and convincing evidence supporting both prongs of the permanent custody test. As the juvenile court's finding in that regard is not against the manifest weight of the evidence, the trial court's remaining findings as to why it denied all other dispositional motions are mere surplusage and neither implicate a manifest miscarriage of justice nor impugn the legitimacy of the judicial process. Father's first assignment of error is overruled.

## III.

{¶44} Father's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

                                                                    
BETTY SUTTON
FOR THE COURT


CARR, J.
FLAGG LANZINGER, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

TODD E. CHEEK, Attorney at Law, for Appellant.

ANGELA WYPASEK, Prosecuting Attorney, and TIMOTHY BOGNER, Assistant Prosecuting Attorney, for Appellee.

LEE POTTS, Attorney at Law, for Mother.

MICHELE SHERRIN, Guardian ad Litem.